**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO: 4:04CV-019-M**

**ORENA JOHNSON, AS ADMISTRATRIX OF**
**THE ESTATE OF JEFFREY NEAL JOHNSON**                                       **PLAINTIFF**

**V.**

**MARK COMBS, ET AL.**                                                                          **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment by Defendants, Mark Combs, et al. [DN 31]. Also before the Court is a Motion by Plaintiff to Exclude the testimony of Defendants' expert witness, William Alexander Payne [DN 28]. Fully briefed, these matters stand ripe for decision. For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion to Exclude is **DENIED as moot.**

**I. STANDARD OF REVIEW**

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories, and affidavits, establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific

facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

This case arises out of the fatal shooting of Jeffrey Neal Johnson (Johnson) by Defendants Mark Combs (Combs), Kenny Perkins (Perkins), and Jeff McWhorter (McWhorter). The Defendants are Kentucky State Troopers who each shot Johnson in the early morning hours of June 12, 2002. Johnson's mother, Orena Johnson (Orena) now brings this action to redress what she views as violations of federal and state law arising out of the shooting.

According to the testimony on record, there were only five witnesses to the shooting: Combs, McWhorter, Perkins, Deputy James Sparks (Sparks), and Deputy Roger Green (Green). The stories of these witnesses corroborate one another in every material respect and

constitute the complete factual record for the time of the shooting. During the late evening on June 11, 2002 while heading home from his shift, Perkins heard a 911 call over his radio and proceeded to encounter Johnson, who he determined to be the subject of the call. Johnson, a mentally ill man, had left his house with a four-inch knife in his possession. Orena had called 911 to get Johnson some help. By the time Perkins first saw Johnson, he had stabbed himself repeatedly with the knife, which he still had in his possession. Noticing that Johnson had made a substantial cut to the side of his neck, Perkins called for an ambulance. Shortly thereafter, McWorther and Combs arrived on the scene, at which point Johnson began running through the parking lot of a nearby church. Perkins, McWhorter, and Combs left their cruisers and pursued Johnson by foot.

      In their pursuit of Johnson by foot, the Troopers took several precautions. First, they maintained a 21-foot interval between themselves and Johnson, as they had been taught to do in their training in dealing with armed persons. They also informed Johnson that they were "there to help him, not hurt him," and that they "would get him any help that he needed." Despite these offers, Johnson repeatedly told the Troopers that they were going to have to shoot him. Finally, the Troopers had their pistols pointed in Johnson's direction, ready to fire in case he were to suddenly attack them.

      In addition to negotiation, the Troopers considered using "pepper" spray, but the 21-foot distance between themselves and Johnson rendered the spray useless. During the negotiations, the ambulance arrived, as did Deputies Sparks and Green. Throughout the negotiations, two things were constant: Johnson frequently cut himself with his knife, and

he emphasized on several occasions that the Troopers were going to have to kill him.

The pursuit and negotiation lasted for approximately 13 minutes, at which point Johnson raised his knife and charged at the three Troopers. The Troopers backpedaled, but Johnson charged so quickly that he got to within 6 to 8 feet of them before they could react. All three Troopers reacted in the same way: by firing their weapons at Johnson. Collectively, the three Troopers shot Johnson a total of ten times. Johnson died instantly, though it remains unknown which Trooper was responsible for his death. The Troopers testified that they shot Johnson in self-defense. Additionally, Deputy Sparks, who was a bystander to the incident, testified that, "[i]t appeared to me that the only alternative the troopers had, to prevent Mr. Johnson from cutting or stabbing one or more of them, was to fire their weapons as he ran toward them." Deputy Green likewise testified that, "[i]t appeared to me that the troopers did everything they could do, but when Mr. Johnson went after them with the knife and they had no other alternative but to fire their weapons to prevent him from injuring or killing them."

Based on this incident, Orena has brought federal and state claims on behalf of her son's estate. The Court has previously dismissed all the claims against the Commonwealth, the Kentucky State Police, and the Troopers in their official capacity, including claims for failure to train and vicarious liability. The remaining Counts are at issue in this motion. In Count I, Orena brings what amounts to an excessive force claim based on the shooting of her son, which she contends was an unreasonable seizure in violation of the Fourth and Fourteenth Amendments. In Count II, Orena claims that Combs, McWhorter, and Perkins

-4-

committed the torts of assault and battery in the shooting and killing of her son. In Count III, Orena asserts that the acts and omissions of Combs, McWhorter, and Perkins were negligent, reckless, or wanton. In Count V, Orena seeks punitive damages. In Count VI, Orena asks for a trial by jury, compensatory and punitive damages, a recovery of her costs, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, and any other relief to which she may be entitled.

### III. DISCUSSION

In their motion, the Troopers make several arguments as to why they should be entitled to summary judgment. As to the federal claims, the Troopers contend that their actions did not violate Johnson's rights under either the Fourth or the Fourteenth Amendments. Moreover, the Troopers argue that they are protected by the doctrine of qualified immunity because their actions did not violate clearly established law. As to the state claims, the Troopers take the position that self-defense is a complete defense to any assault and battery claim. They also argue that their actions were not negligent, reckless, or wanton. Finally, the Troopers seek an award for attorney fees as well as costs and sanctions pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1927, F.R.C.P. 11, and the Court's inherent power to assess costs against a party for bad faith litigation.

#### A. Excessive Force under the Fourth Amendment

The Troopers contend that Plaintiff cannot state a claim for excessive force under the Fourth Amendment because the Troopers' use of force was objectively reasonable under the

circumstances. The Plaintiff argues that it was not objectively reasonable to use deadly force on a mentally ill man armed with only a four-inch knife.

The use of excessive or unreasonable force by police officers in the exercise of their authority gives rise to a § 1983 cause of action.[1] Tennessee v. Garner, 471 U.S. 1, 5 (1985). "[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach."[2] Graham v. Connor, 490 U.S. 386, 395 (1989). Though the reasonableness standard under the Fourth Amendment is not capable of precise definition, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. Furthermore, "[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The objective standard allows for "split-second judgments - circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a given

---

[1] 42 U.S.C. § 1983 states in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State...subjects or causes to be subjected, any citizen...to the deprivation of any rights, privileges, or immunities secured by the Constitution...shall be liable..."

[2] As the Defendants' noted in their brief, it is probable that the Plaintiff's referenced the Fourteenth Amendment as the basis through which the Fourth Amendment reasonableness standard is made applicable to the states. To the extent the Plaintiff intends to state a separate Fourteenth Amendment claim, any such claim is dismissed on authority of Graham.

situation." Id. at 388.

As to the specific question of deadly force, deadly force may be used "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Rhodes v. McDannel, 945 F.2d 117, 120 (6th Cir. 1991), cert. denied, 502 U.S. 1032 (1992) (finding deadly force to be appropriate when an individual holding a knife advanced to within four to six feet of the officers and failed to heed warnings to stop). See also Wood v. City of Lakeland, 203 F.3d 1288, 1292-93 (11th Cir. 2000) (a suicidal suspect armed with a box cutter shouting profanity directly at officers slid to within six to eight feet of the officers before the officers employed deadly force). Contrarily, persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others. Yates v. Cleveland, 941 F.2d 444, 447 (6th Cir. 1991).

In Gaddis v. Redford Township, 364 F.3d 763, 776 (6th Cir. 2004), the Sixth Circuit cited two other circuit court cases to distinguish the mere possession of a knife from the use of a knife as a weapon. In Samples v. City of Atlanta, 846 F.2d 1328, 1332 (11th Cir. 1998), the officer shot a suspect who merely opened a knife and had not yet attacked anyone with it. Gaddis, 364 F.3d at 776. In Zuchel v. City of Denver, 997 F.2d 730, 735-36 (10th Cir. 1993), the facts suggested that the victim had not threatened anyone nor had he aggressively brandished a weapon when the police shot him. Gaddis, 364 F.3d at 777. As the victims posed no threat to the officers in those cases, it was objectively unreasonable to use deadly force. The court also concluded that it was objectively reasonable to shoot Gaddis, who was also mentally ill, sixteen times since the shots were fired in a single volley. Id. In a

somewhat similar case to the one before the Court, a sister court in Tijerina v. Fillion, No. 1:97-cv-762, 1999 U.S. Dist. LEXIS 6603, at *19, *20 (W.D. Mich. May 3, 1999) found that where the plaintiff presented no evidence which contradicted the officers' account of how the shooting occurred, the officer was entitled to summary judgment as a matter of law as the record permitted no other conclusion. According to the officers' account, the plaintiff ran out of a house and lunged at the retreating officer with a knife; the officer, in turn, used deadly force to defend himself. Id. Thus, the Plaintiffs in that case could not state a claim for excessive force under § 1983. Id. at *29.

In making the reasonableness inquiry, a subject's mental state is one of the factors that should be taken into account. Gaddis, 364 F.3d at 775. cf. Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001) (refusing to adopt a per se rule classifying suspects as mentally disabled persons and serious criminals though noting mental disturbance is a factor to consider under Graham). A reasonable officer is, however, even allowed to use deadly force against an unarmed, mentally ill person, if the officer has a reason to believe that such person poses a threat to his safety or to the safety of others. Clem v. Corbeau, 284 F.3d 543, 554 (4th Cir. 2002) (citing Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996)).

In Porter v. City of Muncie, No. IP 98-1491-C H/G, U.S. Dist. LEXIS 7385, at *25 (S.D. IN Feb. 16, 2000), the court found that a police officer who made a split-second decision, after a protracted attempt to negotiate with the victim to abandon her weapons, to fire his weapon at a mentally ill woman who charged at him with a knife and a meat cleaver did not violate the Fourth Amendment. The facts of that case are very similar to those before

the Court: the officers tried to maintain a safe distance between themselves and the mentally ill victim, Id. at *6, the victim cried several times, "f... you, go ahead and shoot me," Id., the officer only shot after the victim approached him with apparent intent to use the deadly weapons, Id. at *10, and it was apparent that the victim was mentally disturbed. Id. at *27. Specifically, the court noted that the victim's mental illness did not reduce the threat she posed to the officer. Id. at *26. In Easley v. Kirmsee, 235 F.Supp. 2d 945, 965 (E.D. WI 2002), the court similarly found no Fourth Amendment violation when an officer shot an inebriated victim, who had made several self-inflicted cuts, and who charged at the officer with a knife. In that case, the officer did not use any lesser degree of force, such as spray, due to the immediate threat on his life. Id.

Based on the case law, the Troopers' use of deadly force was objectively reasonable. Johnson charged at them with a knife, and he had repeatedly mentioned the possibility of "suicide by cop." Officers are entitled to use "deadly force" when their own lives are at risk. Despite Plaintiff's assertions to the contrary, the Troopers' lives were clearly at risk. Moreover, Johnson's mental illness does not alter the conclusion that the Troopers were entitled to defend themselves. Whether or not Johnson was mentally ill, he posed an immediate threat to the Troopers when he charged at them with a deadly weapon. The Troopers had a right to protect themselves under the law.

The Plaintiff's arguments and authority are unpersuasive. Russo v. City of Cincinnati, 953 F.2d 1036, 1045 (6th Cir. 1992) is distinguishable in that a material dispute of fact existed as to whether the victim in that case had actually charged at the police. Despite

Plaintiff's insistence to the contrary, no material dispute of fact exists in this case. Moreover, the record in Russo suggested that ten to twelve minutes elapsed between two rounds of shots by the officers. Id. As for the Plaintiff's citation to cases concerning the subduing a mentally ill man who is primarily a threat to himself, the Court agrees with the Defendants' position that the sole basis for their use of deadly force was the protection of their own lives. Also, the Court does not consider the events prior to the shooting to be a violation of the Fourth Amendment.

### B. Qualified Immunity

The initial step in the qualified immunity analysis involves a determination of whether the plaintiff has shown a violation of a constitutionally-protected right. A negative answer to this question ends the inquiry concerning qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, the Court need not further engage in a qualified immunity analysis.

### C. State Law Claims

Counts II and III assert state law claims arising out of the Troopers' deadly use of force. Having granted summary judgment on the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. United Mine Workers v. Gibbs, 383 U.S. 715, 725-26 (1966).

### D. Attorney's Fees, Costs, and Sanctions

Defendants ask the Court to award attorney's fees, costs, and sanctions under 42 U.S.C. § 1988, 28 U.S.C. § 1927, F.R.C.P. 11, and pursuant to the Court's inherent power

to assess costs against a party for bad faith litigation. The Plaintiff vehemently opposes the imposition of fees, costs, and sanctions, as it argues triable issues of facts exist in this case.

Rule 11 sanctions are appropriate when the district court determines that an attorney's conduct is not "reasonable under the circumstances." Mann v. G & G Mfg., Inc., 900 F.2d 953, 958 (6th Cir. 1990). As for fees under § 1988, the court in Riddle v. Egensperger, 266 F.3d 542, 547 (6th Cir. 2001) noted,

> an award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct. . . . A prevailing defendant should only recover upon a finding by the district court that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.

The court in Shepherd v. Wellman, 313 F.3d 963, 969 (6th Cir. 2002) set forth the standard for imposing fees under § 1927:

> [S]anctions may be awarded against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. We construe "vexatiously multiplying proceedings" to include conduct where "an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of non-frivolous claims." Jones v. Cont'l Corp., 789 F.2d 1225, 1232 (6th Cir. 1986). We have also held that § 1927 sanctions are appropriate where "an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by the member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" Holmes v. City of Massillon, 78 F.3d 1041, 1049 (6th Cir. 1996) (quoting In Re Ruben, 825 F.2d 977, 984 (6th Cir. 1987)). Simple inadvertence and negligence are not grounds for imposing § 1927 sanctions. See Ridder v. City of Springfield, 109 F.3d 288, 298 (6th Cir. 1996).

Here, the Court does not find the imposition of fees, costs, or sanctions to be appropriate. Plaintiff's pursuit of this claim was not egregious nor was it frivolous.

Defendant's request for fees, costs, and sanctions is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DN 31] is **GRANTED**. Plaintiff's Motion to Exclude the testimony of Defendants' expert witness, William Alexander Payne [DN 28] is **DENIED as moot**.

cc: counsel of record
04cv-019Johnson